**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**


    **vs.**                                                    **1:14-CR-169**
                                                                **(MAD)**

**ONIEL MCKENZIE,** *also known as* **Darrin Clark,**
*also known as* **Shower,**


                              **Defendant.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**OFFICE OF THE UNITED**                   **DANIEL HANLON, AUSA**
**STATES ATTORNEY**                        **SOLOMON B. SHINEROCK, AUSA**
James T. Foley U.S. Courthouse
445 Broadway, Room 218
Albany, New York 12207
Attorneys for the United States

**GARY GREENWALD AND**                     **GARY GREENWALD, ESQ.**
**PARTNERS, P.C.**
99 Brookside Avenue
Chester, New York 10918
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

    Defendant is charged in a one (1) count indictment with knowingly and intentionally

possessing with the intent to distribute one or more controlled substances, in violation of Title 21,

United States Code, Section 841(a)(1).  The violation allegedly involved five kilograms or more

of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled

substance in violation of Title 21, United States Code, Section 841(b)(1)(A), and 100 kilograms

or more of a mixture or substance containing a detectable amount of marijuana, a Schedule I

controlled substance, in violation of Title 21, United States Code, Section 841(b)(1)(B).  *See* Dkt. No. 12.

Currently pending before the Court is Defendant's motion seeking the following relief:

1.  For an Order suppressing from use at trial, any and all evidence recovered from the searches of unit numbers 296 and 85 at Mabey's self-storage facility; search of 2006 Jeep Grand Cherokee New York Registration CDP4868 with a VIN #1J4HR48N06C146951; and search of residence located at 6707 Oakhill Circle, North Greenbush, New York, as said searches were conducted in violation of the Defendant's rights pursuant to the United States Constitution and Federal Rules of Evidence; or in the alternative a hearing to determine the same; and

2.  For an Order requiring a *Franks* Hearing and/or for suppression of the evidence; and

3.  For an Order determining that the "Good Faith Exception" does not permit the admissibility of the evidence and/or suppression of the evidence; or in the alternative a hearing to determine the same; and

4.  For an Order, pursuant to Rule 16 of the Federal Rules of Criminal Procedure, requiring the Government to produce and permit the defendant and his counsel to discover and inspect each of the items requested herein; and

5.  For an Order directing the Government [to] provide[ ] a Bill of Particulars; and

6.  For an Order, pursuant to Rule 404(b) of the Federal Rules of Evidence, requiring the Government to give notice of its intention to use evidence of other crimes, wrongs, or bad acts of the defendant and of the general nature of any such evidence it intends to introduce at trial; and

7.  Pursuant to Rules 12(b)(4) and 16 of the Federal Rules of Criminal Procedure . . ., and in accordance with the doctrine of *Raviaro v. United States*, 353 U.S. 53 (1957), disclosing the names, dates of birth, criminal records, etc., of any confidential sources o[r] informants from who the Government presently intends to elicit testimony at trial; and

8.  Pursuant to *United States v. Saa*, 859 F.2d 1067 (2d Cir. 1998), directing the Government to make the confidential informants available to the defense so that they [may] be interviewed prior to trial; and

9.     For an Order, pursuant to the doctrine enunciated in *United States v. Giglio*, 405 U.S. 150 (1972) requiring full disclosure of any relationship and/or agreements as and between the Government and any witness, co-defendant or unindicted co-conspirator; and

10.    For an Order, pursuant to the Due Process clause of the Fifth and Fourteenth Amendments to the Constitution, for the disclosure of exculpatory or favorable evidence requested herein; and

11.    For an Order, pursuant to 18 U.S.C. § 3500, requiring the Government to disclose all statements and reports withing the meaning of the *Jencks Act*; and

12.    For an Order, pursuant to the Fifth and Sixth Amendments to the United States Constitution and Rule 26.2 of the Federal Rules of Criminal Procedure, requiring all Government agents to retain their rough notes; and

13.    For an Order, pursuant to Rule 16 of the Federal Rules of Criminal Procedure, requesting the Government to make available a list of documents it intends to introduce at trial; and

14.    For an Order permitting leave to file additional motions; and

       Together with such other and further relief as the Court [d]eems just and proper.[1]

## II. BACKGROUND

On October 4, 2013, Christopher T. Gilroy, an Investigator with the New York State Police, swore three separate and successive affidavits before the Honorable Thomas A. Breslin in support of search warrants relating to an investigation into a suspected drug trafficking organization operating in the Albany, New York area. *See* Dkt. No. 30-2 at ¶¶ 1, 5. On each of

---

[1] According to the Local Rules, "no party shall file or serve a memorandum of law which exceeds twenty-five (25) pages in length, unless the party obtains permission from the Court to do so prior to filing. All memoranda of law exceeding five (5) pages shall contain a table of contents and, wherever possible, parallel citations." N.Y.N.D. L.R. Cr. P. 12.1(a). Despite not seeking the Court's permission, Defendant's memorandum of law is fifty-five pages in length and does not contain a table of contents. Although the Court will consider all arguments raised, Defendant is hereby placed on notice that any additional filings that do not comply with the Local Rules of this Court will be summarily rejected.

the three occasions that Investigator Gilroy applied for these search warrants on October 4, 2013, Judge Breslin read the affidavit and other documents in support of the applications, requested Investigator Gilroy to swear that the facts presented are true, and, upon affirmative response, Investigator Gilroy signed the affidavit in his presence. *See id.* at ¶¶ 6-9.

**A.     Unit 296**

Investigator Gilroy swore to the first affidavit on October 4, 2013 at 1:55p.m., seeking a warrant to search Unit 296 at Mabey's Self Storage Facility in East Greenbush, New York (the "Unit 296 Affidavit"). *See* Dkt. No. 30 at 2; Dkt. No. 28-2. The Unit 296 Affidavit recounted an investigation that stretched back to July 2013, when an informant began to provide information regarding a criminal organization that the Government contends was headed by Defendant and responsible for distributing multiple kilogram quantities of cocaine in the Albany, New York area. *See* Dkt. No. 28-2 at 5. The informant indicated that the criminal organization had narcotics shipped to UPS stores packaged in boxes and white five-gallon buckets, where they would be picked up by female members of the organization and taken to local storage units. *See id.*

The Government contends that the informant's information conveyed in the Unit 296 Affidavit was reliable. Dkt. No. 30 at 3. In the Unit 296 Affidavit, Investigator Gilroy claims that the informant had been recruited by a former "business associate" turned enemy of Defendant, for the purpose of robbing Defendant's distribution organization. *See* Dkt. No. 28-2 at 6. As such, Investigator Gilroy claims that the informant was familiar with the organization's methods. *See id.* The informant provided a number of facts that were corroborated by official records and the personal investigation of Investigator Gilroy and other law enforcement officers,

including, the following: (1) corroborated reports regarding the makes and models of the cars driven by Defendant's alleged associates Deondra Forney, Latrina Riggins, and Dewayne Williams; (2) a corroborated report regarding the location of Williams' apartment; (3) a corroborated report regarding Riggins' use of the storage units; (4) a corroborated report regarding the organization's use of white construction buckets for packaging; and (5) a corroborated report regarding the use of UPS stores to receive packages before bringing them to storage areas. *See id.* at 6-8.

In addition to the information provided by the informant, the Unit 296 Affidavit also set forth information gathered in the course of surveillance and investigation conducted by Investigator Gilroy and other law enforcement officers. This information included, among other things, that Riggins had rented, used, and accessed multiple storage units. *See* Dkt. No. 28-2 at ¶¶ 10, 23, 30, 38, 40. Investigators further observed Riggins retrieve boxes from a UPS Store and transfer them to Unit 296 at Mabey's Self Storage Facility. *See id.* at ¶¶ 36-38. A trained police canine later gave a positive alert for the presence of a narcotic and/or marijuana in Unit 296. *See id.* at ¶¶ 36-39.

The Unit 296 Affidavit also stated that, on a separate occasion, investigators observed Riggins departing Mabey's Self Storage Facility and proceeding to a nearby parking lot, where she transferred a box from her vehicle to an unidentified male, who put it in his vehicle and exited the parking lot. *See id.* at ¶¶ 23-26. Investigators also learned that Riggins had access to a second nearby unit, Unit 85 at Mabey's Self Storage Facility, along with several other individuals. Investigators also spoke with the site manager who indicated that he observed individuals backing the rear end of vehicles into the storage unit, as if trying to conceal what was being loaded/off loaded. *See id.* at ¶ 31.

The Unit 296 Affidavit also discussed security surveillance footage that Investigator Gilroy and Special Agent Cryan reviewed after speaking with the site manager at Mabey's Self Storage.  *See id.* at ¶ 30.  According to the Unit 296 Affidavit, the video footage captured Riggins entering the storage facility on September 25 at 5:20p.m.  *See id.*  The footage also shows Riggins utilizing the security gate key pad to access the facility and, according to Mabey's records, Riggins utilized the access code assigned to unit 85.  *See id.*  After entering the storage facility, Riggins did not access unit 85 and remained in the storage facility for approximately eight minutes.  *See id.*  Upon exiting the facility, Riggins again utilized the access code assigned to unit 85.  *See id.*

The Unit 296 Affidavit also states that, on October 3, 2013, members of the Drug Enforcement Task Force conducted surveillance in the area of Riggins' place of employment.  *See* Dkt. No. 28-2 at ¶ 35.  At approximately 4:31p.m., Riggins entered her 2007 Acura MDX and traveled to the UPS Store located at 740 Hoosick Road, Troy, New York.  *See id.* at ¶ 36.  At approximately 5:08p.m., Special Agent Cryan observed Riggins retrieve eleven (11) sealed boxes from the store.  *See id.* at ¶ 37.  Riggins placed the boxes in her vehicle and then proceeded to the Mabey's Self Storage Facility.  *See id.*  At approximately 5:35p.m., Special Agent Cryan witnessed Riggins access storage unit 296.  *See id.* at ¶ 38.  Subsequently, Riggins secured unit 296 and left the area.  *See id.*

At approximately 7:30p.m., the area of unit 296 was subject to examination by a police canine trained the in the detection of narcotics and/or marijuana.  *See id.* at ¶ 39.  The canine handler and canine examined several units, including unit 296.  *See id.*  Investigator Gilroy contends that the canine gave a positive alert on unit 296 for the presence of a narcotic and/or marijuana, but did not alert to any other unit.  *See id.*  The affidavit sets forth that on June 1, 2012,

the canine and handler successfully completed the Law Enforcement Canine Training Course, which was sponsored by the New York State Division of Criminal Justice Services.  *See id.*  The canine has been certified in narcotics and marijuana detection.  *See id.*

On October 4, 2013, at approximately 9:30a.m., Special Agent Cryan interviewed the site manager at Mabey's and was informed that unit 296 was being rented by Darrin Clark of Long Beach, California.  *See* Dkt. No. 28-2 at ¶ 40.  Mabey's records indicated that unit 296 was rented on July 5, 2013 and that the facility had never been accessed using the specific pass code assigned to unit 296 since the account had been opened.  *See id.*  Additionally, the records indicated that Riggins utilized the pass code assigned to unit 85 to gain access to the storage facility on October 3, 2013 at approximately 5:35p.m.

**B.    Unit 85 and the Jeep**

Investigator Gilroy submitted a second affidavit on October 4, 2013, at 3:52p.m., which sought (1) a warrant to search unit 85 at Mabey's Self Storage and (2) a warrant to search a 2006 Jeep Cherokee (the "Jeep") with a New York registration of GVP4868 and VIN #1J4HR48N06C146951 (the "Unit 85/Jeep Affidavit").  *See* Dkt. No. 28-4.  The facts set forth in the Unit 296 Affidavit were incorporated into the Unit 85/Jeep Affidavit.  *See id.* at ¶ 10.

The Unit 85/Jeep Affidavit further provides that, on October 4, 2013, at approximately 12:10p.m., law enforcement officials were conducting surveillance of unit 96 at Mabey's Self Storage.  *See id.* at ¶ 11.  During their surveillance, the officials observed a 2006 Jeep Grand Cherokee enter the grounds of the storage facility.  *See id.*  Special Agent Cryan observed a black male exit the Jeep and gain access to unit 296.  *See id.*  Subsequently, the unidentified male,

secured unit 296 and then drove away. *See id.* Before leaving the facility, the male subject paid the monthly storage bill and then left the area. *See id.*

Surveillance personnel then followed the Jeep to the area of Third Street and Judson Street in Albany, New York. *See id.* According to the affidavit, the male subject exited the vehicle, looked around, returned to the vehicle, and then drove off and parked the Jeep in front of 27 Thornton Street. *See id.* At this point, the male exited the vehicle and approached two males who were standing next to a Ford Explorer. *See id.* The hood of the Ford Explorer was open. *See id.* At this time, two uniformed officers approached the operator of the Jeep, who was identified as Darren Clark – the Defendant in the present matter. *See id.* According to the affidavit, while speaking with the officers, Defendant discarded his keys in the engine block area of the Ford Explorer. *See id.* After speaking with the officers, Defendant left the area in a gray Lexus. *See id.* Law enforcement officials maintained constant visual surveillance of the Jeep and eventually subjected the vehicle to an examination by a police canine trained in the detection of narcotics and marijuana. *See id.* The canine gave a positive alert for the presence of a narcotic or marijuana. *See id.* Additionally, law enforcement observed six cardboard boxes inside the Jeep, which, according to Investigator Gilroy, were similar to the boxes that Latrina Riggins placed in unit 296 on October 3, 2013. *See id.*

The Unit 85/Jeep Affidavit further stated that, at approximately 2:23p.m., law enforcement officials executed the Unit 296 Search Warrant. *See id.* at ¶ 12. Pursuant to the warrant, approximately 100 pounds of marijuana were seized, which were housed within white plastic construction buckets. *See id.*

Further, Investigator Gilroy stated that storage unit 85 is registered to Zanalee Allan, but it was being paid for by Latrina Riggins. *See id.* at ¶ 13. The affidavit also provides that records

from Mabey's Self Storage show that Riggins had used the passcode uniquely assigned to unit 85 to access the facility and possibly other units. *See id.* Investigator Gilroy also claimed that Mabey employees reported seeing white construction buckets inside of unit 85 that are similar to those recovered from unit 296 earlier that day. *See id.*

**C.     The Oakhill Apartment**

A third affidavit was sworn by Investigator Gilroy on October 4, 2013, at 6:38p.m., and sought a warrant to search the residence located at 6707 Oakhill Circle, North Greenbush, New York (the "Oakhill Apartment Affidavit"). *See* Dkt. No. 30-1. The Oakhill Apartment Affidavit incorporated the facts set forth in the Unit 296 Affidavit and the Unit 85/Jeep Affidavit. *See id.* at ¶ 9.

The Oakhill Apartment Affidavit further stated that, in executing the warrant for the Jeep at approximately 4:00p.m. on October 4, 2013, investigators recovered approximately sixty pounds of marijuana in boxes retrieved earlier from unit 296 of Mabey's Self Storage Facility. *See id.* at ¶ 10. The affidavit further provides that the Jeep was registered to Chantell M. Chambers and was operated by Defendant. *See id.* Further, Investigator Gilroy indicated that, prior to abandoning the Jeep, Defendant was observed driving it by officers in the Oakhill apartment parking lot. *See id.* Finally, the affidavit stated that records indicate that Chantell Chambers and Defendant (Darrin Clark) reside in the apartment. *See id.*

**III. DISCUSSION**

**A.     Illegal search**

9

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  Criminal defendants seeking to suppress evidence must make a showing that their own Fourth Amendment rights were violated by a challenged search or seizure.  *See Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978).

For decades, the touchstone of a court's analysis of whether a Fourth Amendment "search" occurred was whether the government violated a defendant's reasonable expectation of privacy. *See Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring); *see also United States v. Hamilton*, 538 F.3d 162, 167 (2d Cir. 2008).  Recently, however, the Supreme Court has revived the "Fourth Amendment's property-rights baseline," *Florida v. Jardines*, 569 U.S. ——, ——, 133 S. Ct. 1409, 1417 (2013), and made clear that "Fourth Amendment rights do not rise or fall with the *Katz* formulation," *United States v. Jones*, 565 U.S. ——, ——, 132 S. Ct. 945, 950 (2012), because "[t]he *Katz* reasonable-expectations test 'has been added to, not substituted for,' the traditional property-based understanding of the Fourth Amendment." *Jardines*, 133 S. Ct. at 1417 (quoting *Jones*, 132 S. Ct. at 951-952); *see also United States v. Aguiar*, 737 F.3d 251, 259 (2d Cir. 2013); *United States v. Brooks*, No. 12 Cr. 166(RRM), 2012 WL 6562947, *5 (E.D.N.Y. Dec. 17, 2012).

Accordingly, the Court will consider whether Defendant has shown that an unlawful search occurred under either the Fourth Amendment's property-rights baseline or the *Katz* reasonable-expectation-of-privacy test.  *See Jones*, 132 S. Ct. at 950-51 n.3; *Jardines*, 133 S. Ct. at 1417.

### *1. Property-Rights Baseline*

In *Jardines*, the Supreme Court held that "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment." *Jardines*, 133 S. Ct. at 1417-18.  The majority opinion reached this conclusion by applying the Fourth Amendment's traditional property-rights approach, finding that a search occurred because officers made an unlicensed physical intrusion of the defendant's home by entering its curtilage.  *See id.* at 1414.  Thus, *Jardines* instructs that a dog sniff just outside of a home constitutes a search.  The question then is whether it follows that under the approach of *Jardines* or other precedent, a comparable dog sniff outside of a commercial storage unit is also a search.

Under the traditional property-rights approach to the Fourth Amendment, a defendant must show "an unlicensed physical intrusion . . . took place in a constitutionally protected area" to show that a "search" occurred.  *Id.* at 1415; *see also, e.g., United States v. Jackson*, 728 F.3d 367, 373 (4th Cir. 2013), *cert. denied*, 134 S. Ct. 1347 (2014) (holding that no search occurred under *Jardines* because the area searched was beyond the curtilage of the defendant's dwelling).  However, because "[t]he Fourth Amendment 'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects," *Jardines*, 133 S. Ct. at 1414 (quoting *Oliver v. United States*, 466 U.S. 170, 176 (1984)), the only "constitutionally protected areas" where unlicensed physical intrusions are prohibited are "persons, houses, papers, and effects ."  *Id.*  That is, "[t]he Fourth Amendment protects against trespassory searches only with regard to those items ('persons, houses, papers, and effects') that it enumerates."  *Jones*, 132 S. Ct. at 953 n.8.  The limited ability of this "simple baseline" to sufficiently protect against invasions of privacy not involving physical intrusions is what led the Supreme Court in *Katz* to "add[ ] to the baseline" and ensure that "property rights 'are not the sole measure of Fourth

11

Amendment violations.'" *Jardines*, 133 S. Ct. at 1414 (quoting *Soldal v. Cook County*, 506 U.S. 56, 64 (1992)).

The Fourth Amendment protects as "houses" places such as garages, business offices, stores, and warehouses, and prohibits warrantless physical entries into such places. *See* 1 Wayne LaFave, Search & Seizure § 2.1(a) (5th ed.) (citing cases); *see also See v. City of Seattle*, 387 U.S. 541, 543 (1967) ("The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property"). And, as Justice Scalia recognized in *Jardines*, the Fourth Amendment also considers curtilage, "the area 'immediately surrounding and associated with the home,'" to be "part of the home itself for Fourth Amendment purposes." *Jardines*, 133 S. Ct. at 1414.

In *Parrilla*, a criminal defendant argued that police officers conducted an unlawful warrantless search when they allowed a narcotics dog to sniff the premises surrounding a business and detect the odor of narcotics emanating from contraband inside the building. *See United States v. Parrilla*, No. 13 Cr. 360, 2014 WL 2111680, *3 (S.D.N.Y. May 13, 2014). As the Southern District noted in *Parrilla*, "the area surrounding a business has never been considered part of the business itself, and the concept of curtilage is limited to the home." *Id.* at *4. The *Parrilla* court cited *Dow Chemical Co. v. United States*, where the Supreme Court found "'the intimate activities associated with family privacy and the home and its curtilage'" simply do not reach "'the outdoor areas or spaces between structures and buildings of a manufacturing plant [.]'" *Id.* at *5 (quoting 476 U.S. 227, 236, 106 S. Ct. 1819, 90 L. Ed. 2d 226 (1986)). The district court further reasoned that, "[u]nlike interior areas where business may be conducted in private, the [business's exterior] is unenclosed, accessible to the public via a short driveway, open to public view, and used for

visitors and customers to come and go." *Id.* Based on this reasoning, the Southern District declined to extend a "business curtilage" protection in *Parrilla*.

In the present matter, to the extent that Defendant is asking the Court to extend the principles set forth in *Jardines* and *Thomas* to the facts in the present case, his request must be denied. The Fourth Amendment's traditional property-rights baseline is not an appropriate vehicle for such an endeavor, as it protects only those rights that are traditionally accepted and specifically enumerated. In *Jardines*, Justice Scalia remarked that "[o]ne virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy." *Jardines*, 133 S. Ct. at 1417. There the Court had "no doubt" that officers entered a constitutionally protected area, because "[t]he front porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'" *Id.* at 1415 (quoting *Oliver*, 466 U.S. at 182 n.12). Here, however, the officers did not enter a constitutionally protected area when they entered the unenclosed area of the self storage facility, that was open to all persons entitled to be on the grounds of the storage facility.

The caselaw is clear that the areas surrounding homes, not businesses or commercial property, are entitled to special constitutional protections. While areas surrounding one's home act as a buffer zone to the intimate and private activities of the home itself, areas surrounding businesses are not host to such intimate activities. Therefore, while a Fourth Amendment search "undoubtedly occur[s]" where "the Government obtains information by physically intruding on persons, houses, papers, or effects," *Jardines*, 133 S. Ct. at 1414 (quoting *Jones*, 132 S. Ct. at 950-51 n.3) (quotation marks omitted), the warrantless canine sniff here did not constitute a physical intrusion into one of these constitutionally protected areas; and, therefore, did not violate Defendant's rights under the Fourth Amendment's property-rights baseline.

13

### 2. *Reasonable Expectations of Privacy*

*Katz* expanded the scope of the Fourth Amendment's protection by recognizing that "the Fourth Amendment protects people, not places" and therefore forbids government investigations that violate a person's reasonable expectations of privacy. *See Katz*, 389 U.S. at 361 (Harlan, J., concurring); *see also United States v. Hamilton*, 538 F.3d 162, 167 (2d Cir. 2008) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978)).  The inquiry under *Katz* "involves two distinct questions: first, whether the individual had a subjective expectation of privacy; and second, whether that expectation of privacy is one that society accepts as reasonable." *Hamilton*, 538 F.3d at 167 (citing *Katz v. United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring); *United States v. Chuang*, 897 F.2d 646, 649 (2d Cir. 1990)).  "A protected privacy interest has been found in a wide array of circumstances, ranging from ownership or regular occupancy of a home, . . . to status as an overnight guest in someone else's home, . . . or even in someone else's hotel room, . . . to a rental storage unit, . . . to one's business premises, . . . including the desk drawers and file cabinets contained therein, . . . as well as the contents of one's office computer[.]" *Thomas*, 538 F.3d at 167-68 (internal citations omitted).

"On the other end of the spectrum from its recent conclusion in *Jardines*, the Supreme Court — applying the *Katz* analysis — has held that dog sniffs of luggage and vehicles do not violate any reasonable expectations of privacy, because they are not very intrusive and disclose only the presence or absence of contraband, information that a person cannot legitimately expect will be kept private." *Parrilla*, 2014 WL 2111680, at *7 (citing *United States v. Place*, 462 U.S. 696 (1983); *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000); *Illinois v. Caballes*, 543 U.S.

14

405 (2005)).  Despite this finding, the Second Circuit has rejected the notion that a canine sniff itself can never violate a person's reasonable expectations of privacy.  *See United States v. Thomas*, 757 F.2d 1359 (2d Cir. 1985); *United States v. Hayes*, 551 F.3d 138, 144 (2d Cir. 2008).

In support of his position, Defendant cites to *United States v. Thomas*, 757 F.2d 1359 (2d Cir. 1985).  *See* Dkt. No. 28 at 13.  In *Thomas*, the magistrate judge found that probable cause existed to issue a search warrant, in part, because of a "canine sniff" outside of the defendant's apartment that indicated the presence of narcotics inside.  *See Thomas*, 757 F.2d at 1365-66.  The Second Circuit noted that, while a canine sniff of a person's luggage is permissible in an airport, due to heightened privacy interests that an individual has in his dwelling, the canine sniff outside of the defendant's apartment constituted a search in violation of the Fourth Amendment.  *See id.* at 1367.  Specifically, the court held that, with regard to a the canine sniff at the door of the apartment, "the defendant had a legitimate expectation that the contents of his closed apartment would remain private."  *Id.*  The Court explained that, although a dog's

> sniff in an airport is not a search, [it is] quite another [thing] to say that a sniff can never be a search.  The question always to be asked is whether the use of a trained dog intrudes on a legitimate expectation of privacy.  While one generally has an expectation of privacy in the contents of personal luggage, this expectation is much diminished when the luggage is in the custody of an air carrier at a public airport.
>
> * * * *
>
> Although using a dog sniff for narcotics may be discriminating and unoffensive relative to other detection methods, and will disclose only the presence or absence of narcotics, . . . it remains a way of detecting the contents of a private, enclosed space.  With a trained dog police may obtain information about what is inside a dwelling that they could not derive from the use of their own senses.

*Id.* at 1366-67 (citations omitted); *see also United States v. Hayes*, 551 F.3d 138, 144 (2d Cir. 2008) (reaffirming *Thomas* and holding that, "[c]onsistent with the strong expectation of privacy

in the sanctity of one's home, . . . a canine sniff at the door of an apartment – even if the only

function of the sniff is to reveal illegal narcotics inside that apartment – is nonetheless a 'search'

subject to the constraints of the Fourth Amendment").

Applying similar reasoning, the Supreme Court held in *Kyllo v. United States* that using an

enhanced sensory instrument – a thermal imaging device used to detect heat patterns – to discover

details about the contents of a closed home was an unreasonable search that violated reasonable

expectations of privacy. *See Kyllo v. United States*, 533 U.S. 27 (2001).  And similarly, in a

concurring opinion in *Jardines*, Justice Kagan, writing on behalf of herself and Justices

Sotomayor and Ginsburg, stated the view that the Supreme Court could have easily held, as an

application of *Kyllo*, that a canine sniff of a home violates reasonable expectations of privacy.

*Jardines*, 133 S. Ct. at 1418 (Kagan, J., concurring) ("The police officers conducted a search

because they used a 'device . . . not in general public use' (a trained drug-detection dog) to

'explore details of the home' (the presence of certain substances) that they would not otherwise

have discovered without entering the premises").

Contrary to Defendant's arguments, the Court's holding in *Thomas* is clearly

distinguishable from the present matter.  As the court discussed in *Parrilla*, there are significant

differences between residential and commercial properties for Fourth Amendment purposes.

While it is well-established that the Fourth Amendment protects commercial premises as well as

dwellings from unreasonable searches and seizures, *see Dow Chem. Co. v. United States*, 476

U.S. 227, 236 (1986) (holding that a business "plainly has a reasonable, legitimate, and objective

expectation of privacy within the interior of its covered buildings"), a reasonable "expectation of

privacy in commercial premises . . . is different from and . . . less than a similar expectation in an

individual's home." *New York v. Burger*, 482 U.S. 691, 700 (1987).  Defendant fails to cite to any

16

authority that extended the *Thomas* court's rationale to a non-residential situation and this Court refuses to do so.  Simply stated, Defendant did not have a reasonable expectation of privacy to the area outside of his storage units; an area generally open to the public.  *See Parrilla*, 2014 WL 2111680, at *7 (finding that a canine sniff that reveals the scent of contraband escaping from within a commercial building does not violate the proprietor's reasonable expectations of privacy); *United States v. Hogan*, 122 F. Supp. 2d 358, 369 (E.D.N.Y. 2000); *United States v. Mikelic*, No. 3:10-cr-132, 2011 WL 4368565, *5 & n.13 (D. Conn. Sept. 19, 2011) (declining to extend *Thomas* to a canine sniff of a commercial storage unit and finding that it was not a "search" for Fourth Amendment purposes).  The canine sniff was intended only to inform the officers of the presence or absence of illegal narcotics, information that a person cannot legitimately expect will be kept private.  *See Parrilla*, 2014 WL 2111680, at *7 (citing *United States v. Place*, 462 U.S. 696 (1983); *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000); *Illinois v. Caballes*, 543 U.S. 405 (2005)).

Moreover, the reasonableness of any expectation of privacy Defendant had in the storage units is further diluted by the fact that others, including Riggins, had access to them.  Defendant's argument that he could have slept in the storage unit fails to change the fundamental nature of the space as a non-residential commercial space, and Defendant fails to substantiate this assertion with any facts suggesting that the applicable zoning ordinances, rental agreements, and Maeby's policy would permit him to use the storage unit as a residence.  Even assuming he could have slept there without Maeby's knowledge or permission, such actions would still fail to present a subjective expectation of privacy "that society is prepared to accept as objectively reasonable." *Caballes*, 543 U.S. at 408.

Finally, to the extent that Defendant is arguing that the canine sniff of the Jeep violated his Fourth Amendment rights, his claim is without merit, since the Jeep was parked on a public street. *See United States v. Fred*, 50 F.3d 548, 551 (8th Cir. 1995), *vacated on other grounds*, 517 U.S. 1152 (1996) (concluding that canine sniff of car parked on the street is so limited in its intrusion on protected privacy interests that it does not amount to a search for Fourth Amendment purposes); *United States v. Ludwig*, 10 F.3d 1523, 1526-27 (10th Cir. 1993) (upholding canine sniff of car in parking lot of motel where it was conducted without particular suspicion); *Merrett v. Moore*, 58 F.3d 1547, 1553 (11th Cir. 1995) (holding that a canine sniff of the exterior of a car waiting at a roadblock was permissible without reasonable suspicion); *United States v. Grogg*, 534 F.3d 807, 810-11 (7th Cir. 2008).

Based on the foregoing, the Court finds that the warrantless canine sniff of the storage units did not violate Plaintiff's Fourth Amendment rights.

## B.     Validity of the Search Warrants[2]

In his motion, Defendant contends that the search warrants were improperly issued because they were based on inadmissible hearsay and information was provided from an unnamed informant, whose credibility was not established. *See* Dkt. No. 28 at 15-16. Further, Defendant argues that the canine's qualifications were not presented in the affidavits and contends that this renders the facts based on the canine's searches improper grounds to support a finding of probable cause.

---

[2] In the present case, Defendant failed to submit his own affidavit or an affidavit from another with personal knowledge of the facts surrounding the search. The affidavit submitted by Defendant's attorney was not made on personal knowledge. As such, the Court denies Defendant's request for a suppression hearing. *See United States v. Kantipuly*, No. 06-CR-065E(F), 2006 WL 4046151, *7-*8 (W.D.N.Y. Oct. 16, 2006) (citations omitted).

"In determining whether probable cause for a search warrant exists, the issuing judicial officer is simply to make a practical common sense decision whether, given the 'totality of the circumstances' set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Barnes*, 399 F. Supp. 2d 169, 178 (W.D.N.Y. 2005) (citing *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)); *see also United States v. Ponce*, 947 F.2d 646, 650 (2d Cir. 1991). A "magistrate's finding of probable cause is itself a substantial factor tending to uphold the validity of this warrant." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983); *see also United States v. Ventresca*, 380 U.S. 102, 106 (1965) (holding that a magistrate's disinterested finding of probable cause based on reasonable inferences is given preference). "The process does not deal with hard certainties, but with probabilities." *Gates*, 462 U.S. at 230; *see also United States v. Thomas*, 757 F.2d 1359, 1367 (2d Cir. 1985) ("Probable cause to believe certain items will be found in a specific location . . . need not be based on direct, first-hand, or 'hard' evidence") (internal citation omitted).

It is well settled that an affidavit to a search warrant that relies on hearsay "'is not to be deemed insufficient on that score, so long as a substantial basis for crediting that hearsay is presented.'" *Illinois v. Gates*, 462 U.S. 213, 241-42 (1983) (quotation omitted). Government investigatory agents are entitled to a "presumption of credibility" when a court evaluates their hearsay information in an affidavit. *United States v. Morill*, 490 F. Supp. 477, 478 (S.D.N.Y. 1980) (finding probable cause in an affidavit based in part on hearsay information provided by federal and local law enforcement agents); *United States v. Ventresca*, 380 U.S. 102, 111 (1985) ("Observations of fellow officers of the [federal] Government engaged in a common investigation

are plainly a reliable basis for a warrant applied for by one of their number"); *Velardi v. Walsh*, 40 F.3d 569, 574 (2d Cir. 1994).

"'An evidentiary hearing on a motion to suppress ordinarily is required if "the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question,"'" *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) (quotation and other citations omitted), "including an affidavit of someone alleging personal knowledge of the relevant facts," *United States v. Barrios*, 210 F.3d 355, 2000 WL 419940, *1 (2d Cir. 2000) (citing *United States v. Gillette*, 383 F.2d 843, 848 (2d Cir. 1967); *see also United States v. Ciriaco*, 121 Fed. Appx. 907, 908-09 (2d Cir. 2005); *United States v. Richardson*, 837 F. Supp. 570, 572 (S.D.N.Y. 1993) (holding that "[i]t is well established that without a supporting affidavit of someone with personal knowledge of the underlying facts, the court need not resolve factual disputes that may be raised by the moving papers").  Moreover, the Local Rules of Criminal Procedure set forth the process that a criminal defendant must follow when the Government disagrees about the need for an evidentiary hearing: "If the parties agree that a suppression hearing is necessary and the papers conform to the requirements of L.R. Cr. P. 12.1(a), the Court will set the matter for a hearing.  If the government contests whether the Court should conduct a hearing, the defendant must accompany the motion with an affidavit, based upon personal knowledge, setting forth facts which, if proven true, would entitle the defendant to relief."  N.Y.N.D. L.R. Cr. P. 12.1(e).

### 1. The Unit 296 Search Warrant Application

In his motion, Defendant contends that the evidence from this search must be dismissed for a variety of reasons.  First, Defendant argues that the Government failed to identify their

20

informant in the search warrant application, which required the issuing court to apply a heightened level of scrutiny.  *See* Dkt. No. 28 at 8.  Since the informant had no established credibility, the information he provided could not satisfy the burden of probable cause necessary for the issuance of the warrant without "significant legally-obtained corroboration."  *Id.* at 8-9. Further, Defendant contends that most of the information contained in the search warrant application discussed activities that were non-criminal in nature.  *See id.* at 9-10.  "In fact, none of the details of the [informant's] tales of drug-running and criminality were arguably corroborated to any degree until the police employed an illegal canine sniff search of storage unit number 296." *Id.* at 10.

Contrary to Defendant's assertions, the affidavit in support of the Unit 296 search warrant set forth a substantial basis for concluding that probable cause existed.  The Unit 296 Affidavit recounted an investigation that began in July 2013 and continued through the date of the application, October 4, 2013.  As discussed in detail above, the affidavit was based on Investigator Gilroy's personal knowledge acquired through his involvement in the investigation, as well as information obtained by investigators and agents of the New York State Police and DEA.  Further, Investigator Gilroy provided information obtained through a confidential informant.  *See, e.g.,* Dkt. No. 28-2 at ¶ 4.  The affidavit provided that the informant was a former "business associate" turned enemy of Defendant, which is how he became familiar with his methods.  Many of the facts provided by the informant were corroborated by official records and the personal investigation of Investigator Gilroy and other members of the task force.  Some such facts include (1) corroborated reports regarding the makes and models of the cars driven by Defendant's alleged associates Deondra Forney, Latrina Riggins, and Dewayne Williams; (2) a corroborated report regarding the location of Williams' apartment; (3) a corroborated report

regarding Riggins' use of the storage units; (4) a corroborated report regarding the organization's

use of white construction buckets for packaging; and (5) a corroborated report regarding the use

of UPS stores to receive packages before bringing them to storage areas.  *See id.* at 6-8.

Defendant complains of the hearsay nature of much of the information conveyed in the

affidavit; however, it is well settled that a search warrant application that relies on hearsay (is not

deemed insufficient on that score, so long as a substantial basis for crediting the hearsay is

presented." *Gates*, 462 U.S. at 241-42 (citations omitted).  As discussed, the informant's

information was corroborated and a reasonable basis was provided for the basis of his knowledge.

Further, Investigator Gilroy set forth an extensive account of the surveillance conducted

by himself and other members of the task force.  Through this surveillance, Investigator Gilroy

observed that Riggins had rented, used, and accessed multiple storage units.  *See* Dkt. No. 28-2 at

¶¶ 10, 23, 30, 38, 40.  Moreover, investigators observed Riggins retrieve boxes from a UPS Store

and transfer them to Unit 296 at Mabey's Self Storage Facility.  *See id.* at ¶¶ 36-38.  Thereafter, a

trained police canine gave a positive alert for the presence of a narcotic and/or marijuana in Unit

296.  *See id.* at ¶¶ 36-39.

The Unit 296 Affidavit further detailed that, on a separate occasion, investigators

observed Riggins depart Mabey's Self Storage, proceed to a nearby parking lot, and transfer a box

to an unidentified male, who put it in his vehicle and left the parking lot.  *See id.* at ¶¶ 23-26.  The

investigators also learned that Riggins had access to Unit 85, along with several other individuals,

and that she used the unique access code for Unit 85 to get into the storage facility before entering

Unit 296.  Further, individuals were observed backing the rear end of vehicles into the storage

unit as if trying to conceal what was being loaded or off-loaded.  *See id.* at ¶¶ 31-33.

Based on the foregoing, the Court finds that, given the totality of the circumstances set forth in the affidavit, there was a fair probability that contraband or evidence of a crime would be found in Unit 296. *See Barnes*, 399 F. Supp. 2d at 178 (citing *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)). Accordingly, the Court denies Defendant's motion insofar as it seeks to suppress evidence obtained through the execution of the Unit 296 search warrant.

### 2. The Unit 85/Jeep Affidavit

As mentioned, all of the facts supporting probable cause set forth in the Unit 296 Affidavit were incorporated into the Unit 85/Jeep Affidavit. *See* Dkt. No. 28-4 at ¶ 10. Further, the Unit 85/Jeep Affidavit stated that, in executing the search warrant on Unit 296 at approximately 2:23p.m. on October 4, 2013, investigators seized approximately 100 pounds of marijuana, which were housed in white plastic construction buckets. *See id.* at ¶ 12.

Additionally, the Unit 85/Jeep Affidavit indicated that investigators observed a male, later identified as Defendant, access Unit 296 and then drive the Jeep to 27 Thornton Street, Albany, New York. *See id.* at ¶ 11. After discarding the keys into the engine area of a nearby vehicle whose hood was open, Defendant left the area and officers observed six cardboard boxes in plain view inside the Jeep, similar to the one Riggins placed into Unit 296. *See id.* Thereafter, a certified police canine gave a positive alert for the presence of a narcotic and/or marijuana in the Jeep. *See id.*

Based on the totality of the circumstances, the Court finds that the Unit 85/Jeep Affidavit clearly supported the state court's finding of probable cause to issue the warrant.

### 3. The Oakhill Apartment

The third affidavit sworn by Investigator Gilroy on October 4, 2013 at 6:38 p.m. sought a search warrant for the residence located at 6707 Oakhill Circle, North Greenbush, New York.  *See* Dkt. No. 30-1.  The facts supporting probable cause set forth in the Unit 295 and Unit 85/Jeep Affidavits, together with the related warrants, were incorporated into the Oakhill Apartment Affidavit.  *See id.* at ¶ 9.  The Oakhill Apartment Affidavit further provided that, in executing the warrant for the Jeep at approximately 4:00p.m. on October 4, 2013, investigators recovered approximately 60 pounds of marijuana in boxes that had been retrieved earlier from Unit 296 of Maeby's Self Storage.  *See id.* at ¶ 10.  Moreover, the affidavit states that the Jeep was registered to Chantell Chambers and Defendant had been observed operating it.  *See id.*  Prior to abandoning the vehicle, Defendant was observed driving the vehicle in the Oakhill apartment parking lot.  *See id.*  Further, both Defendant (Darrin Clark) and Chambers were listed as residents on the rental application for the residence at 6707 Oakhill Circle, and the Jeep was listed on the rental agreement as well.  *See id.*  Finally, Investigator Gilroy affirmed that, based on his experience, it was likely that drug traffickers would use multiple storage locations, including their homes, to keep additional marijuana and related records.  *See id.* at ¶ 11.

Having found that the other search warrant applications were supported by probable cause, the Oakhill Apartment Affidavit, which detailed the executions of the other search warrants, was undoubtedly supported by probable cause.

### 4. Qualifications of the canine

Defendant also argues that the affidavits failed to provide the state court with the "background of either the canine or the canine handler.  Such as, the appropriate certifications so

that the Court would be aware that the canine was properly trained and was an animal that could be used for the purposes at hand.  There are certifications, which are normally attached to search warrants so that the Court can confirm that the canine in issue has [the] requisite background to do what is being asked."  Dkt. No. 28 at 11.

Although a canine alert may establish probable cause to search, a defendant is entitled to contest the reliability of the canine sniff.  *See Florida v. Harris*, 133 S. Ct. 1050, 1057–58 (2013) (finding a dog's alert can provide probable cause to search but holding that the defendant "must have an opportunity to challenge . . . evidence of a dog's reliability," whether by (1) "cross-examining the testifying officer," (2) "introducing his own fact or expert witnesses," (3) contesting "the adequacy of a certification or training program," or (4) inquiring whether "circumstances surrounding a particular alert may undermine the case for probable cause").  The *Harris* Court explained that, "[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search."  *Id.* at 1057.  When a defendant challenges "the reliability of the dog overall or of a particular alert," the court should "weigh the competing evidence" to determine whether the "facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime."  *Id.* at 1058.

In the present matter, in the Unit 296 Affidavit, Investigator Gilroy set forth the following facts concerning the canine search and its qualifications:

> In this instance, the canine handler and Canine examined several units including the one that is the subject of this affidavit.  At this time, the Canine gave a positive alert on Unit # 296 for the presence of a narcotic and/or marijuana.  The Canine did not alert at any other unit.  On June 1, 2012, Canine and handler successfully completed the Law Enforcement Canine Training Course which

was sponsored by the New York State Division of Criminal Justice
Services.  This Canine has been certified in narcotics and marijuana
detection.

Dkt. No. 28-2 at ¶ 39.

In his reply, Defendant contends that the Government "seems to suggest if an officer in a

search warrant states that a canine, who has been given proper training as well as the handler, was

used in the course of a given search, the affiant's statement about the propriety of such action

automatically succeeds because the affiant was told that they had received this training.  The

reality is the officer who is making that statement as an affiant has no knowledge that this is true,

outside what the other officer told him."  Dkt. No. 35 at ¶ 105.  Defendant continues by arguing

that it "seems it would be more appropriate to require the affiant on behalf of the canine and its

handler to provide proof that they have the appropriate authority to make the searches in question.

The fact that they were 'trained' and further the police officer said that they were trained, does not

mean automatically that they were trained." *Id.*  Further, Defendant again argues that it was

improper to have the canine search other units before proceeding to the area in front of Unit 296.

*See id.* at ¶ 108.

Contrary to Defendant's assertions, the Government provided the state court judge with

sufficient information regarding the training of the canine and his handler.  Courts in the Second

Circuit have found affidavits containing similar facts regarding the training and certification of a

canine and its handler to be sufficient.  *See, e.g., United States v. Negron*, No. 04 CR. 929, 2005

WL 701237, *1-*2 (S.D.N.Y. Mar. 25, 2005); *United States v. Dillon*, 810 F. Supp. 57, 61-62

(W.D.N.Y. 1992) (holding that the canine sniff technique "'is now sufficiently well-established to

make a formal recitation of a police dog's *curriculum vitae* unnecessary in the context of ordinary

warrant applications . . .'" and finding that the magistrate could properly infer that the police

26

canines "were sufficiently certified so as to insure the reliability of the positive 'hits' on the six UPS parcels") (quotation omitted); *United States v. Watson*, 551 F. Supp. 1123, 1127 (D.D.C. 1982) (same).  The information provided in the warrant affidavits regarding the canine and handler's training and certification was sufficient

In *United States v. Cedano–Arellano*, 332 F.3d 568 (9th Cir. 2003), the court held that when a defendant requests dog-history discovery to pursue a motion to suppress, Federal Rule of Criminal Procedure 16 compels the government to disclose the "handler's log," as well as "training records and score sheets, certification records, and training standards and manuals" pertaining to the dog. *Id.* at 570–71; *see also United States v. Thomas*, 726 F.3d 1086, 1096 (9th Cir. 2013).  These materials were held to be "crucial to [the defendant's] ability to assess the dog's reliability, a very important issue in his defense, and to conduct an effective cross-examination of the dog's handler" at the suppression hearing.  *Id.* at 571.  These disclosures are "mandatory" when the government seeks to rely on a dog alert as the evidentiary basis for its search.  *See United States v. Cortez–Rocha*, 394 F.3d 1115, 1118 n.1 (9th Cir. 2005).

Here, however, Defendant has made entirely conclusory allegations concerning the reliability, training, and certification of the canine and handler.  Defendant has failed to submit any evidence that would call into question the reliability of the hits in this case.

Further, nothing in the record indicates that Defendant requested any evidence concerning the reliability, certifications, and training of the canine and its handler.[3]  Without such evidence, Defendant's conclusory assertions are insufficient to support his motion to suppress.

Accordingly, the Court denies Defendant's motion to suppress on this ground.

---

[3] The Court notes that, according to the docket, discovery was due by the Government on October 23, 2015. *See* Dkt. No. 37.

### *5. Validity Under New York State Law*

Defendant makes several arguments that the search warrants were issued in violation of New York State law and the New York Constitution.  *See, e.g.,* Dkt. No. 28 at 21 (citing *People v. Devone*, 15 N.Y. 3d 106 (2010) for the proposition that "the level of suspicion necessary to engage in a warrantless canine sniff of a vehicle's exterior . . . [is] 'founded suspicion'"). Defendant's reliance on the requirements under New York law are entirely unavailing.  The Second Circuit has determined that "the touchstone of a federal court's review of a state search warrant secured by local police officials and employed in a federal prosecution is the Fourth Amendment and its requirements, and no more.  In *United States v. Pforzheimer*, 826 F.2d 200, 204 (2d Cir. 1987), this court explicitly held that 'federal law should apply to . . . federal criminal prosecution[s], even though the underlying investigation leading to prosecution was conducted solely by state officials.'" *United States v. Smith*, 9 F.3d 1007, 1014 (2d Cir. 1993).

Accordingly, the Court denies Defendant's motion to suppress on these grounds.

### C.   *Franks v. Delaware*, 438 U.S. 154 (1978)

The Fourth Amendment prohibits "unreasonable searches and seizures," and the Warrants Clause mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  "There is . . . a presumption of validity with respect to the affidavit supporting [a] search warrant." *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  "In certain circumstances, however, a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure." *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003) (footnote and citations

omitted).  "However, '[e]very statement in a warrant affidavit does not have to be true.'"  *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000) (quotation omitted).

In *Franks v. Delaware*, the Supreme Court held that, although generally a defendant may not challenge the veracity of a sworn statement that the police used to procure a search warrant, the Fourth Amendment requires that the court hold a hearing to determine the veracity of such statements if the defendant requests such a hearing and makes a substantial preliminary showing that (1) the affiant made "a false statement knowingly and intentionally, or with reckless disregard for the truth," and that (2) "the allegedly false statement [was] necessary to the finding of probable cause[.]"  *Franks*, 438 U.S. at 155-56.

> To determine if the false information was necessary to the issuing judge's probable cause determination, *i.e.*, material, "a court should disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant." . . . If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate.

*Canfield*, 212 F.3d at 718 (internal quotation omitted).  Thus, "[t]he ultimate inquiry is whether, after putting aside erroneous information and material omissions, 'there remains a residue of independent and lawful information sufficient to support probable cause.'"  *Id.* (quotation omitted).

In the present matter, Defendant states in a conclusory fashion that Investigator Gilroy "made false statements knowingly and intentionally or with reckless disregard for the truth and the false statements where [sic] necessary to finding of probable cause."  Dkt. No. 28 at ¶ 54.  Defendant contends that Investigator Gilroy "left out critical facts relative to the Jeep that mislead the State Court."  *Id.* at ¶ 55.  In an affidavit submitted by Defendant, Paul David Breslin, who was present on October 4, 2013 at approximately 10:00a.m., when Defendant parked the Jeep in

front of 27 Thorton Avenue.  *See* Dkt. No. 28-7.  Mr. Breslin claims that he observed police

officers approach Defendant and request identification.  *See id.* at 1.  At this point, Defendant left

and the police officers stayed with the vehicle for approximately fifteen-to-twenty minutes, until

additional officers arrived and stated that they smelled marijuana.  *See id.*  Mr. Breslin further

claims that the doors and windows of the Jeep were closed and that he did not notice the smell of

marijuana while near the vehicle.  *See id.*  At this point, Mr. Breslin claims that he heard the

police officer state that the vehicle was unlocked and opened the doors to the Jeep at

approximately 11:00a.m.  *See id.*  Mr. Breslin states that he was at the location where the Jeep

was located from the time Defendant parked it, to the time that the police took it away.  *See id.*

Finally, Mr. Breslin contends that he is "certain the police searched the vehicle before the warrant

arrived, because I watched them do so and know it was before the warrant because I heard when

they stated they had the warrant which was much later then when they first opened the doors."

*See id.* at 1-2.  Defendant argues that this critical information, which was omitted from the search

warrant application, "was the basis of their attempt to get a search warrant[.]" Dkt. No. 28 at ¶ 56.


　　　As the Government correctly asserts, even if the facts asserted in Mr. Breslin's affidavit

were proven true, neither it nor anything in Defendant's motion presents a misstatement or

omission that would entitle Defendant to suppression or a *Franks* hearing.  Nothing in the search

warrant application makes mention of a search of the Jeep by police officers and, therefore, it

necessarily follows that this information was not necessary for the finding of probable cause.

Further, even assuming that Investigator Gilroy orally provided this information to the state court

judge, the information would have been immaterial since the remaining information contained in

the Unit 85/Jeep Affidavit clearly supported the finding of probable cause.  Even if there was a

pre-warrant search, Defendant fails to allege or submit any evidence suggesting that Investigator Gilroy was informed of such information so as to claim that he deliberately or recklessly omitted it from his affidavit. *See United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008).

Finally, Defendant contends that Investigator Gilroy's affidavits implied that he was working with more than one confidential informant when, in fact, there was but a single informant. *See* Dkt. No. 28 at ¶ 57. Defendant's conclusory allegation, which is made without citation to anything in the record before the Court, is entirely without merit. The Investigator Gilroy's affidavits repeatedly referred to "a confidential informant," not multiple informants. *See, e.g.*, Dkt. No. 28-2 at ¶¶ 4, 9 ("a DEA source of information (SOI)"); Dkt. No. 28-4 at ¶ 4 ("a confidential informant"); Dkt. No. 28-8 at ¶ 9 ("a confidential informant"). Defendant's conclusory allegation is entirely belied by the record before the Court.

Based on the foregoing, the Court denies Defendant's motion for a *Franks* hearing.


**D.      Standing to Challenge the Alleged Pre-Warrant Search of the Jeep**

As discussed, through Mr. Breslin's affidavit, Defendant contends that police officers searched the Jeep prior to the search warrant being issued. In the alternative to the grounds for denying the motion discussed above, the Court finds that Defendant does not have standing to challenge the search of the Jeep. In the Unit 85/Jeep Affidavit, Investigator Gilroy indicates that Defendant "discarded his keys in the engine block area of the Ford Explorer" while speaking with two police officers. Dkt. No. 28-4 at ¶ 11. Without retrieving his keys, Defendant left the area in a gray Lexus. *See id.* Further, the Oakhill Apartment Affidavit indicates that the Jeep is registered to Chantell Chambers, not Defendant. *See* Dkt. No. 28-8 at ¶ 10. Although a person in lawful possession of a vehicle that he or she does not actually own generally can have standing to

bring a Fourth Amendment challenge, Defendant abandoned any such expectation of privacy when he left the keys to the unlocked vehicle in the area of the Ford Explorer parked nearby. *See United States v. Valdez Hocker*, 333 F.3d 1206, 1209 (10th Cir. 2003); *United States v. Sinclair*, No. 09-cr-70, 2011 WL 6012975, *2 (N.D. Cal. Dec. 1, 2011) (denying motion to suppress without prejudice where the defendant failed to make any showing that he had authority to exclude all others, except for the vehicle's registered owner, from using the vehicle and, therefore, he failed to demonstrate that he had a legitimate expectation of privacy in the vehicle) (citation omitted); *United States v. Blanco*, 844 F.2d 344 (6th Cir. 1988), *cert. denied* 486 U.S. 1046 (1988) (finding a lack of standing to object to a search of a car when the accused surrendered the car keys and control of the car to other individuals); *United States v. Savides*, 665 F. Supp. 2d 686, 689-90 (N.D. Ill. 1987) (holding that the defendant's statement disavowing ownership of the car, coupled with his act of kicking the keys under the vehicle, clearly precluding him from asserting a legitimate expectation of privacy in the vehicle).

Accordingly, the Court finds that, in the alternative, Defendant has not established that he had a legitimate expectation of privacy in the Jeep when the alleged pre-warrant search occurred. *See United States v. Benitez-Arreguin*, 973 F.2d 823, 828 (10th Cir. 1992) (holding that a "proponent of a motion to suppress who relies upon the lawful possession factor bears the burden of presenting at least some evidence that his or her possession was lawful").

### E.   Inevitable Discovery

Even assuming the police officers searched the Jeep prior to obtaining the warrant and that Defendant had standing to contest the search, the Court finds that the evidence seized is still not subject to suppression because of the inevitable discovery doctrine. Generally, tangible and

testimonial evidence directly or indirectly derived from unconstitutional police conduct must be suppressed because it is tainted or constitutes "fruit of the poisonous tree." *Murray v. United States*, 487 U.S. 533, 536-37 (1988); *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).  If police seize evidence pursuant to a valid search warrant obtained on the basis of information unconnected to an earlier Fourth Amendment violation, there is an independent source for the seizure, and the evidence is untainted and admissible.  *See Murray*, 487 U.S. at 540-41.  Even if the police obtain knowledge during a Fourth Amendment violation, suppression is unwarranted if they would have obtained the same knowledge when executing a valid and independent warrant. *See id.* at 541-42.  There are two prerequisites to the *Murray* rule: "(1) the warrant must be supported by probable cause derived from sources independent of the illegal [conduct]; and (2) the decision to seek the warrant may not be prompted by information gleaned from the illegal conduct."  *United States v. D.K. Johnson*, 994 F.2d 980, 987 (2d Cir. 1993); *see also United States v. Canfield*, 212 F.3d 713, 717-18 (2d Cir. 2000).

In the present matter, the evidence before the Court clearly demonstrates that, even assuming the Jeep was searched prior to the search warrant being issued, the Government was supported by probable cause from sources independent of the alleged illegal search.  Further, the decision to seek the Unit 85/Jeep Search Warrant was not prompted by information gleaned from the illegal search.

Accordingly, the Court finds that, in the alternative, notwithstanding the alleged illegal warrantless search, the evidence is still admissible pursuant to the inevitable discovery doctrine.

**F.      Motion for Discovery and Inspection**

  ***1. Notice of Evidence subject to Suppression***

33

Defendant asks the Court to order discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure. *See* Dkt. No. 28 at ¶¶ 82-84. In its response, the Government asserts that it has "complied with the letter and spirit of Rule 16 and the local discovery rules" and further indicates that it is mindful of its ongoing obligation to promptly produce additional discovery as it become available. *See* Dkt. No. 30 at 17. Further, the Government asserts that it has voluntarily made available to Defendant all items of physical evidence it intends to offer at trial available for Defendant's physical inspection. *See id.* at 17-18. In light of the Government's compliance and acknowledgment of its ongoing responsibilities, the Court denies this aspect of Defendant's motion without prejudice to renew.

### 2. "Catch-all" Hearsay Testimony

Defendant requests an order requiring the Government to provide him with advance notice of hearsay testimony the Government intends to offer pursuant to the "catch-all" hearsay exception of Rule 803(24) and 804(b)(5) of the Federal Rules of Evidence. Since the Government contends that it is unaware of any such potential testimony, the Court denies this aspect of Defendant's motion without prejudice. *See* Dkt. No. 30 at 18.

### 3. Advance Notice of Co-Conspirator Statements

Defendant seeks an order requiring the Government to provide advance notice of co-conspirator statements the Government intends to offer at trial pursuant to Rule 801(d)(2)(E). *See* Dkt. No. 28 at ¶ 90 (citations omitted). As the Government correctly asserts, however, the cases upon which Defendant relies are no longer good law. The statements which Defendant seeks are covered under the Jencks Act, and production is not required until after that witness has testified

on direct examination. *See United States v. Shyne*, 617 F.3d 103, 105-07 (2d Cir. 2010); *In re United States*, 834 F.2d 283, 286-87 (2d Cir. 1987). Accordingly, this aspect of Defendant's motion is denied without prejudice.

### 4. Disclosure of Documents Pursuant to Federal Rule Criminal Procedure 16(a)(1)(C)

Defendant seeks an order requiring the Government to disclose all written statements and items covered under Rule 16(a)(1)(C) of the Federal Rules of Criminal Procedure. *See* Dkt. No. 28 at ¶¶ 92-93. By its very terms, Rule 16(a)(1)(C) applies only to an "organizational defendant." Fed. R. Crim. P. 16(a)(1)(C). Accordingly, Defendant's request is denied.

### 5. Grand Jury Testimony

Defendant seeks an order requiring the Government to disclose the transcript of the individuals who testified before the grand jury in this matter. *See* Dkt. No. 28 at ¶¶ 98-101.

Disclosure of grand jury proceedings is permitted upon a showing that a "ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). "[A] presumption of regularity attaches to grand jury proceedings[.]" *United States v. Leung*, 40 F.3d 577, 581 (2d Cir. 1994). Accordingly, "a defendant seeking disclosure of grand jury minutes has the burden of showing a 'particularized need' that outweighs the default 'need for secrecy' in grand jury deliberations." *United States v. Forde*, 740 F. Supp. 2d 406, 413 (S.D.N.Y. 2010) (citing *United States v. Moten*, 582 F.2d 654, 662 (2d Cir. 1978)); *see also Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959) ("The burden . . . is on the defense to show that a 'particularized need' exists for the minutes which outweighs the policy of secrecy"). "A party makes a showing of particularized need by proving 'that the material they

35

seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed.'" *In re Grand Jury Subpoena*, 103 F.3d 234, 239 (2d Cir. 1996) (quoting *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 222, 99 S. Ct. 1667, 60 L. Ed. 2d 156 (1979)).

It is well-settled that "[h]ope and speculation are wholly insufficient to overcome the rule of secrecy in grand jury proceedings that is embodied in Fed. R. Crim. P. 6(e)." *United States v. Donald*, No. 07-CR-6208, 2009 WL 270181, *6 (W.D.N.Y. Feb. 4, 2009); *see also Forde*, 740 F. Supp. 2d at 414; *United States v. Olin Corp.*, 465 F. Supp. 1120, 1134-35 (W.D.N.Y. 1979). "A review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct." *United States v. Torres*, 901 F.2d 205, 233 (2d Cir. 1990), *overruled on other grounds as recognized by United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010). "This standard applies equally to a defendant's request for the court to conduct in camera inspection of grand jury transcripts." *United States v. Laster*, No. 06 Cr. 1064, 2007 WL 3070599, *1 (S.D.N.Y. Oct. 19, 2007) (citation omitted); *Forde*, 740 F. Supp. 2d at 413-14 (applying particularized need standard to the defendant's request for an in camera inspection of the grand jury minutes).

In the present matter, Defendant seeks the transcript of the testimony of the individuals who testified before the grand jury. *See* Dkt. No. 28 at ¶ 98. Defendant contends that grand jury testimony "should be disclosed anytime the Government demonstrates no need for secrecy . . . and the defense shows a semblance of need[.]" *Id.* at ¶ 100 (citations omitted). Further, Defendant argues that where, "as here, the Government's case may depend on oral, unrecorded statements of the alleged co-conspirators, then any of the Grand Jury testimony regarding the

substance of those statements is necessary to adequately prepare and disclosure should be required prior to trial."  *Id.* at ¶ 101.

Having reviewed Defendant's arguments and the applicable law, the Court finds that Defendant's assertions fall far short of demonstrating that he has a particularized need of this material to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that his request is structured to cover only material so needed.  Defendant's conclusory assertions fail to satisfy any of these three requirements.  In its response, the Government acknowledges that the production of witness statements, including grand jury testimony, is subject to the Jencks Act and disclosure upon the witness' testimony at trial.  *See* Dkt. No. 30 at 19.  Further, the Government acknowledges its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972), and contends that it has complied and will continue to comply with those obligations.

Based upon the Government's representations and the applicable law, the Court denies Defendant's motion for disclosure of grand jury testimony.  The Court would only remind the Government that "its *Brady* obligations trump the Jencks Act, that such obligations include the obligation to produce impeachment materials consistent with *Giglio*, and that such material must be produced 'in time for its effective use at trial.'" *United States v. Jacobs*, 650 F. Supp. 2d 160, 168 (D. Conn. 2009) (quoting *United States v. Coppa*, 267 F.3d 132, 135, 142 (2d Cir. 2001)).

## G.     Bill of Particulars

In his motion, Defendant demands a bill of particulars.  *See* Dkt. No. 28 at ¶¶ 102-105.  Specifically, Defendant argues that, "[g]iven the breadth of this indictment, and the severity of punishment Mr. McKenzie faces, it is necessary for the Government to provide a bill of

particulars as to Mr. McKenzie's involvement." *Id.* at ¶ 104.  Defendant contends that without a

bill of particulars he will be unable to adequately prepare for trial in this matter.  *See id.*

A court should grant a motion for a bill of particulars only where necessary to inform the

accused of the charge against him with sufficient precision to enable him to prepare her defense

and avoid surprise and to enable him to plead his acquittal or conviction in bar of any further

prosecution for the same offense.  *See United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir.

1987) (citations omitted); *see also United States v. Macchia*, 35 F.3d 662, 670 n.1 (2d Cir. 1994)

(quotation and other citations omitted).  The purpose of a bill of particulars is to apprise the

defendant of the essential facts of the crime with which he is charged; it is not an investigative

vehicle for the defense.  *See United States v. Johnson*, 21 F. Supp. 2d 329, 339 (S.D.N.Y. 1998)

(citation omitted).  "The test is not whether the particulars sought would be useful to the defense.

Rather, a more appropriate inquiry is whether the information in question is necessary to the

defense."  *United States v. Guerrerio*, 670 F. Supp. 1215, 1224 (S.D.N.Y. 1987) (citation

omitted).  If the government has provided the defendant with the information he seeks from

another source, *i.e.* through discovery, no bill of particulars is required.  *See United States v.

Laughlin*, 768 F. Supp. 957, 967 (N.D.N.Y. 1991) (citing *United States v. Bortnovsky*, 820 F.2d

572, 574 (2d Cir. 1987)).

The defendant bears the burden of showing that the information requested is necessary

and that he will be prejudiced without it so as to justify granting a bill of particulars.  *See United

States v. Barnes*, 158 F.3d 662, 666 (2d Cir. 1998).  A mere statement that the defendant will be

prejudiced without the bill is insufficient.  *See id.*

In the present matter, other than a conclusory statement regarding the breadth of the

indictment and the fact that he needs a bill of particulars to adequately prepare for his defense,

Defendant has failed to put forth any specific arguments as to why the Court should grant his motion. Based on the evidence before the Court, it is clear that the indictment, together with the discovery that has been provided, sufficiently apprises Defendant of the crime with which he is charged. The information provided makes clear that Defendant has sufficient information to avoid surprise at trial and to enable him to plead double jeopardy if he is ever charged in the future with the same crime.

Accordingly, Defendant's motion for a bill of particulars is denied.

**H.     Rule 404(b) of the Federal Rules of Evidence**

Defendant seeks an order requiring the Government to give notice of its intention to use evidence of other crimes or bad acts pursuant to Rule 404(b). *See* Dkt. No. 28 at ¶¶ 106-109. The Government states that, at this stage of the case, "it is not clear whether the Government will offer 404(b) evidence, and it may not be clear until the time of trial when the defendant raises issues that might be countered by such evidence." Dkt. No. 30 at 22. The Government further indicates that it "is aware of its obligations under this Rule and will 'provide reasonable notice in advance of trial . . .'" of its intention to introduce 404(b) evidence, to the extent it has not already done so." *Id.*

Based on the Government's representations and its acknowledgment of its obligations under Rule 404(b), the Court denies Defendant's motion without prejudice to renew.

**I.     Compelling Disclosure of Informant Identities and Permitting Interview by Defense**

Defendant requests an order compelling the Government to disclose the identities of any confidential informants and all related material pursuant to *Roviaro v. United States*, 353 U.S. 53

(1957).  *See* Dkt. No. 28 at ¶¶ 110-115.  Further, Defendant asks that, in the event that the Government does not call any confidential informant in its case in chief, he be permitted to speak with any such informant for the purpose of determining if they are willing to be interviewed by defense counsel and possibly called during Defendant's case.  *See id.* at ¶¶ 116-120.  Defendant acknowledges that, if the Government calls all informants to testify during trial, the motion will be withdrawn as moot.  *See id.* at ¶ 120.  In response to Defendant's motion, the Government asserts that it "fully intends to disclose this type of impeachment information consistent with its pre-existing obligations under *Brady*, *Giglio*, and the Jencks Act."  Dkt. No. 30 at 23.  Further, the Government contends that it "planned to give this information, particularly *Giglio*, to defense counsel fourteen days prior to the state of trial pursuant to Local Rule 14.1(d)."  *Id.* at 23-24.  The Government argues that this fourteen-day time frame will balance the Government's concern with protecting the informants' safety and Defendant's need to prepare for trial and an effective cross-examination.  *See id.* at 24.

In *Roviaro v. United States*, 353 U.S. 53 (1957) the Supreme Court held that, "[w]here the disclosure of an informant's identity, or the contents of his communication is relevant and helpful to the defense of an accused, or is essential to the fair determination of a cause, the [informant's] privilege must give way."  *Roviaro*, 353 U.S. at 60-61.  The Court explained that

> [n]o fixed rule with respect to disclosure is justifiable.  The problem is one that calls for balancing the public interest in protecting the flow of information against the individuals right to prepare his defense.  Whether a proper balance renders non-disclosure erroneous must depend on the particular circumstances of each case taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Id.* at 62.

The defendant is generally able to establish a right to disclosure where it is "shown that the informant is a key witness or participant in the crime charged, someone whose testimony would be significant in determining guilt or innocence." *United States v. Russotti*, 746 F.2d 945, 950 (2d Cir. 1984); *see also United States v. Roberts*, 388 F.2d 646, 648-49 (2d Cir. 1968). However, simply showing that the confidential informant was a participant in and witness to the crime charged it not enough. *See United States v. Jiminez*, 789 F.2d 167, 170 (2d Cir. 1986). The Second Circuit has stated that "[t]he defendant bears the burden of establishing the need for disclosure, . . . and this requires some demonstration that in the absence of such disclosure the defendant will be denied a fair trial." *United States v. Lilla*, 699 F.2d 99, 105 (2d Cir. 1983) (internal citations omitted).

In the present matter, the Court finds that, in light of limited information provided concerning the role of any confidential informants in the alleged underlying crimes and resulting investigation and the bare assertions regarding their materiality to Defendant presenting a defense, Defendant's motion should be denied without prejudice. Further, the Court finds that this result is even more appropriate in light of the Government's acknowledgment of its obligations under *Brady*, *Giglio*, and the Jencks Act. The Court agrees that disclosure of this information fourteen days prior to trial pursuant to Local Rule 14.1(d) balances the Government's concern with ensuring the informant's safety and Defendant's need to prepare for trial and an effective cross examination.

Based on the foregoing, the Court denies Defendant's motion without prejudice to renew.

**J.**      ***Brady* and *Giglio* Material**

Defendant requests that the Court enter an order directing the Government to provide him with all evidence favorable to him, including evidence that could be used for purposes of impeachment, as *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972) require.  *See* Dkt. No. 28 at ¶¶ 121-137.  The Government asserts that it is aware of its obligations and has acknowledged its continuing obligation.  Further, the Government has agreed to produce any *Giglio* material fourteen days prior to trial, which the Court agrees is sufficient time to make effective use of such evidence and, therefore, satisfies the requirements of due process.  Based on these representations, the Court denies Defendant's motion without prejudice to renew if it becomes necessary for Defendant to do so.

### K.       Motion for Early Jencks Material

Defendant requests an order directing the Government to disclose all "statements and reports within the meaning of the *Jencks Act*, 18 U.S.C. § 3500, not less than three weeks prior to the commencement of the trial in this case."  Dkt. No. 28 at ¶ 138.  Defendant contends that early disclosure is necessary to avoid extensive delays at trial because this case "involves extensive wiretaps and multiple defendants[,]" and multiple "federal law enforcement officers participated in an extensive investigation generating hundreds of reports and documents."  *Id.* at ¶ 139.  In the event the Court denies this request, Defendant requests that the Government comply with the dictates of the Jencks Act by tendering all such material to defense counsel outside the presence of the jury.  *See id.* at ¶ 146.

In response, the Government argues that Defendant's motion should be denied because he has failed to set forth facts sufficient to warrant early disclosure of Jencks material.  *See* Dkt. No. 30 at 26.  The Government contends that Defendant mistakenly claims that the case involves

"'extensive wiretaps and multiple defendants'" and that it was an "'extensive investigation generating hundreds of reports and documents.'" *Id.* Rather, the Government argues that there were no wiretap order in this case, and the investigation did not generate hundreds of reports and documents. *See id.* The Government asks to be permitted to produce this material in its customary manner – at the time trial commences – which exceeds the applicable requirements and minimizes potential for witness intimidation and harm. *See id.*

Under the Jencks Act, 18 U.S.C. § 3500(a), "no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case." The Second Circuit has consistently held that a district court's "power to order pretrial disclosure is constrained by the Jencks Act," and that the district court may not order advance disclosure inconsistent with the Jencks Act itself. *See Coppa*, 267 F.3d at 145-46 (reversing district court's decision ordering early disclosure of Jencks Act material); *see also United States v. Sebastian*, 497 F.2d 1267, 1268–69 (2d Cir. 1974); *United States v. Percevault*, 490 F.2d 126, 129 (2d Cir. 1974) (finding that "the district court did not have statutory authority to compel disclosure [of Jencks Act material] prior to trial over the government's objection").

In light of the authority cited, the Government's acknowledgment of its continuing *Brady* and *Giglio* obligations, and the Government's intention to follow its customary practice to produce any Jencks material at the time trial commences, the Court denies Defendant's motion for early disclosure of Jencks material.

**L.    Preservation of Agents' Rough Notes**

43

Defendant asks the Court for an order directing "all Government law enforcement officers and agents, and the Government attorneys, who were involved in the investigation charged in the above-listed case, to retain and preserve all rough notes and writing that a producible, under Fed. R. Crim. P. 26(F)(1)(2), and *Brady v. Maryland*, 373 U.S. 83 (1963) or which may be relevant to impeachment for purposes under [Rule 806 of the Federal Rules of Evidence]." Dkt. No. 28 at ¶ 148. The Government responded that it "is aware of its obligation under the Jencks Act and considers rough notes of testifying agents as subject to disclosure to the defendant." Dkt. No. 30 at 26.

In light of the Government's acknowledgment of its obligations, the Court denies Defendant's motion without prejudice.

**M.     Motion to Require Designation of Documents to be Introduced at Trial**

Defendant asks the Court to order the Government to designate the documents that it intends to introduce at trial. *See* Dkt. No. 28 at ¶¶ 153-158. Defendant contends that the Court should order this relief for the following reasons: (1) it would permit Defendant to "continue the discovery process in a more deliberate and orderly manner;" (2) Defendant would be prepared to rebut or explain those documents introduced at trial; (3) trial would "proceed without lengthy recesses that would be necessary when the defense needed to locate any writing, or the remainder of writings, that ought to be contemporaneously introduced with the government's documents;" and (4) the requested relief would condense Defendant's case "because it would be possible to concentrate on the designated documents." *Id.* at ¶ 154.

Having reviewed Defendant's motion, the Court finds that his request for the Government to provide a designation of documents to be introduced at trial should be denied at this time. The

Government has already provided Defendant through discovery the documents it intends to introduce at trial. This is not a complex fraud or other document intensive case and the discovery, while comprehensive, is not overly voluminous. Further, the Government is required to file its exhibit list two weeks prior to the start of trial. The exhibit list will designate the documents the Government intends to introduce at trial and will afford Defendant sufficient time to prepare his defense.

Accordingly, the Court denies this aspect of Defendant's motion.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendant's motions (Dkt. No. 28) are **DENIED** in their entirety as set forth herein; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: November 4, 2015
      Albany, New York

Mae A. D'Agostino
U.S. District Judge